Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALLEN CHAIDEZ, <br><br> Plaintiff, <br><br> v. <br><br> COMMUNICATIONS SYSTEMS, INC., ROGER H.D. LACEY, STEVEN C. WEBSTER, RANDALL D. SAMPSON, RICHARD A. PRIMUTH, and MICHAEL ZAPATA, <br><br> Defendants. | Case No: <br><br><br> JURY TRIAL DEMANDED |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Allen Chaidez ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1.  This is an action against Communications Systems, Inc. ("Communications Systems" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated

1

thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed merger (the "Proposed Transaction") of Communications Systems and Pineapple Energy LLC ("Pineapple").

2. On November 12, 2021, Defendants caused to be filed with the SEC a Form S-4 Registration Statement (the "Registration Statement") in connection with the Proposed Transaction.

3. The Registration Statement, which recommends that the Company's shareholders vote in favor of, among other things, the Proposed Transaction, omits and/or misrepresents material information concerning: (1) Communications Systems' and Pineapple's financial projections; (2) the financial analyses performed by the Company's financial advisor, Craig-Hallum Capital Group LLC ("Craig-Hallum"), in connection with its fairness opinion; and (3) potential conflicts of interest involving Company insiders.

4. These material misrepresentations and omissions prevent the Company's shareholders from making a fully informed voting decision on the Proposed Transaction. Accordingly, the Company's shareholders will be irreparably harmed if these material misrepresentations and omissions are not remedied before the anticipated shareholder vote on the Proposed Transaction.

**JURISDICTION AND VENUE**

5. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District and the alleged misstatements entered and the subsequent damages occurred in this District.

8. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

9. Plaintiff is, and has been at all relevant times hereto, an owner of Communications Systems common stock.

10. Defendant Communications Systems, through its subsidiaries, provides connectivity infrastructure products and services for deployments of broadband networks worldwide. The Company is incorporated in Minnesota. The Company's common stock trades on the NASDAQ under the ticker symbol, "JCS."

11. Defendant Roger H.D. Lacey ("Lacey") is Chief Executive Officer and Executive Chairman of the Board of the Company.

12. Defendant Steven C. Webster ("Webster") is a director of the Company.

13. Defendant Randall D. Sampson ("Sampson") is a director of the Company.

14. Defendant Richard A. Primuth ("Primuth") is a director of the Company.

15. Defendant Michael Zapata ("Zapata") is a director of the Company.

16. Defendants Lacey, Webster, Sampson, Primuth, and Zapata are collectively referred to herein as the "Individual Defendants."

17. Defendants Communications Systems and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A. Background of the Company and the Proposed Transaction**

18. Communications Systems classifies its businesses into two segments, E&S and Services & Support ("S&S").

19. According to the Company, its E&S segment designs, develops, and sells Intelligent Edge solutions that provide connectivity and power through Power over Ethernet products and actionable intelligence to end devices in an Internet of Things ecosystem through embedded and cloud-based management software. This segment also offers products such as media converters, network interface cards, and Ethernet switches. The E&S segment's products are used in various markets, including federal government, enterprise, service provider, industrial, security, and surveillance markets.

20. According to the Company, its S&S segment provides software-designed wide-area network and other technology solutions that address IT challenges, including network resiliency, security products and services, network virtualization, and cloud migrations, IT managed services, wired and wireless network design and implementation, and converged infrastructure configuration, deployment and management. This segment primarily serves vertical markets such as healthcare, education, and commercial business.

21. On March 2, 2021, Communications Systems issued a press release announcing that it had entered into a definitive merger agreement with privately held Pineapple, an operator and consolidator of residential solar, battery storage, and grid services solutions. Upon closing of the Proposed Transaction, Communications Systems will commence doing business as Pineapple

4

Energy, with a business model focused on the home solar industry. The press release announcing the Proposed Transaction, states in pertinent part:

### Communications Systems, Inc. Announces Agreement to Merge with Pineapple Energy, LLC

*—CSI to Refocus on Residential Solar and Battery Storage Market—*

*—Concurrently to Acquire Hawaii Energy Connection and E-GEAR—*

*—Intends to Build a Leading National Residential Solar Energy Service Provider—*

*—CSI to Monetize Assets and Distribute Cash to Existing Shareholders—*

*—CSI Will Fully Support Current Business Lines Pending Divestiture—*

March 02, 2021 07:00 AM Eastern Standard Time

MINNETONKA, Minn.--(BUSINESS WIRE)--**Communications Systems, Inc. (NASDAQ: JCS)** ("CSI" or the "Company"), an IoT intelligent edge products and services company, today announced that it entered into a definitive merger agreement with privately held Pineapple Energy, LLC ("Pineapple"), a growing U.S. operator and consolidator of residential solar, battery storage, and grid services solutions. Upon closing, CSI will commence doing business as Pineapple Energy, with a business model focused on the rapidly growing home solar industry. The Company expects shares of the combined company to continue to trade on the Nasdaq Capital Market under the new ticker symbol "PEGY." The definitive merger agreement and transaction have been approved by CSI's Board of Directors and are subject to approval by CSI's shareholders. The transaction is expected to close in the second quarter of 2021.

\*   \*   \*

Members of both CSI's and Pineapple's management teams will assume leadership roles in the combined company. Roger H.D. Lacey, Executive Chairman of CSI, and Mark Fandrich, CSI's Chief Financial Officer, are expected to remain in these same roles. Pineapple's Chief Executive Officer Kyle Udseth, an industry veteran who previously served as an executive at leading residential solar energy providers Sunnova and Sunrun, will assume the Chief Executive Officer position of the combined company. The Company expects to remain in its current headquarters near Minneapolis, Minnesota.

\*   \*   \*

**Cash Dividends; Contingent Value Rights; Continuing Ownership for CSI's Shareholders**

In conjunction with the merger, CSI intends to divest substantially all its current operating and non-operating assets, including its Electronics & Software business, its Services & Support business, real estate holdings, and cash, cash equivalents, and investments. CSI is in discussions and negotiations with potential acquirers of its business segments and real estate holdings. CSI expects the sale proceeds from any pre-merger divestitures to be distributed in the form of a cash dividend to existing CSI shareholders prior to the effective date of the merger. In addition to any proceeds from pre-merger divestitures, CSI expects to distribute to the pre-merger shareholders a cash dividend of at least $1.00 per share prior to the closing of the merger. The Company also intends to make additional cash dividends from cash, cash equivalents, and investments and proceeds from the sale of legacy CSI assets and businesses sold after the merger through the CVRs, as described below.

Under terms of the merger agreement, each CSI shareholder as of the merger record date, will receive Contingent Value Rights ("CVRs") that reflect the right to receive that shareholder's percentage of the net proceeds from the sale of legacy CSI businesses and assets, after the closing. The Company currently expects that these CVRs will be nontransferable. As of September 30, 2020, CSI's net book value was $47.2 million, it had cash, cash equivalents, and investments of $21.0 million and had working capital of $28.5 million.

Additionally, current CSI shareholders will retain shares in the combined company, initially holding approximately 37% of total shares outstanding. This ownership is expected to decrease over time due to earnouts to Pineapple shareholders and capital to be raised through potential future equity offerings, as described below.

**Other information about the Merger and Related Transaction**

- The transaction is structured as a statutory reverse triangular merger under Delaware law under which a new CSI subsidiary will be merged with and into Pineapple. Pineapple will survive the merger and become a wholly-owned subsidiary of CSI.

- CSI directors and executive officers have entered into voting agreements under which they agreed to vote their shares in favor of the merger.

- The Members of Pineapple will receive base consideration of 15.6 million shares of CSI common stock. The base consideration will be increased for any outstanding convertible notes issued by Pineapple in a pre-closing financing, which will convert into additional shares of CSI common stock at a rate of $2.00 per share and be decreased for any outstanding indebtedness of Pineapple in excess of $22.5 million, which will reduce the base consideration at a rate of $2.00 per share;

6

- In addition to the base consideration, Members of Pineapple may receive additional shares pursuant to an earnout. Additional shares of common stock will be issued to Members of Pineapple upon the occurrence of the following milestones:

    o   If Pineapple discharges its Permitted Indebtedness of $22.5 million within three months of closing, then the Members of Pineapple will be entitled to an additional 3.0 million shares.

    o   If, within two years of closing, the CSI common stock achieves a 30-day VWAP (volume weighted average price) of at least $6.00 per share, the Members of Pineapple will be entitled to receive up to 4.0 million shares of common stock (to be increased to 5.0 million if CSI consummates the "Dispositions," (as defined below) by the 18-month anniversary of the closing).

    o   If, within two years of closing, the CSI common stock achieves a 30-day VWAP of at least $8.00 per share, the Members of Pineapple will be entitled to receive up to an additional 4.0 million shares of common stock (to be increased to 5.0 million if CSI consummates the "Dispositions" by the 18-month anniversary of the closing).

- The Board of Directors of CSI will recommend approval of the merger agreement to its shareholders and intends to ask its shareholders to approve:

    o   the transactions (including the merger agreement, the CVR agreement, and issuance of CSI stock consideration),

    o   the amendment of CSI's articles of incorporation to increase the authorized shares and make certain additional changes regarding future shareholder approval requirements;

    o   the adoption of a new equity incentive plan and,

    o   if applicable, the issuance of any new shares in connection with any Private Investment in Public Entity ("PIPE") or other equity offering transaction.

- Prior to closing, CSI may pursue dispositions of legacy assets ("Dispositions'') and declare a cash dividend to its shareholders. CSI will continue to support existing business lines as it pursues new partners or owners for these businesses. To the extent not sold prior to closing, following the closing, CSI will use commercially reasonable efforts to complete the Dispositions of the Company's legacy assets as soon as reasonably practicable (and, in any event, within 18 months of the closing).

- Prior to closing, CSI and Pineapple will cooperate in connection with a potential private equity transaction that would result in the issuance of additional shares of CSI common stock at the closing of the merger.

The merger agreement also contains indemnification provisions, has termination provisions, and under certain circumstances, requires the payment of a termination fee.

Any statement about the merger agreement and the transactions in this press release is a summary and subject to the terms of the merger agreement, which will be filed as an exhibit to a filing with the Securities and Exchange Commission ("SEC"), and to other SEC filings. See "Important Information and Where to Find It," set forth below.

**Financing Growth**

In conjunction with the merger, CSI and Pineapple Energy are exploring equity financing through a private placement that would close in connection with the closing of merger, with proceeds to be used by the combined company to finance additional acquisitions and working capital needs of the combined company. In addition, Pineapple is exploring equity financing that would lower the amount of debt associated with its past and pending acquisitions. Any equity issued by the combined company after closing of the merger would increase the number of post-merger shares outstanding and decrease the percentage ownership of continuing CSI shareholders.

\*   \*   \*

**About Communications Systems, Inc.**

Communications Systems, Inc., an IoT intelligent edge products and services company, provides network infrastructure and services for global deployments of enterprise and industrial networks. CSI operates under its Electronics & Software and Services & Support operating segments. Its Electronics & Software segment provides smart, flexible solutions at network edge, by giving customers the ability to easily provision and proactively manage their networks with actionable insights about their edge devices and connected end points, thereby minimizing the administrative burden of the operator. Its Services & Support segment provides fully managed services for all aspects of design, deployment, support, and maintenance of customer networks. With partners and customers in over 50 countries, CSI has built a reputation as a reliable global innovator focusing on quality and customer service. For more information visit: commsysinc.com.

**About Pineapple Energy LLC**

Pineapple Energy was founded to acquire and grow leading local and regional solar, storage, and energy services companies nationwide. Pineapple's vision is to power the energy transition through grass-roots growth of solar electricity paired with battery storage on consumers' homes. Pineapple puts the customer at the heart of

everything it does, building long-term relationships to create and share in recurring revenue from the electric grid of the future. Pineapple's cornerstone acquisitions of certain assets of Sungevity and Horizon Solar Power in December 2020 brought an installed customer base of 44,000+ solar customers across 12 states.

**Advisors**

Northland Capital Markets serves as financial advisor to CSI in connection with the transaction and JMP Securities serves at financial advisor to Pineapple Energy. Ballad Spahr LLP is acting as legal counsel to CSI and Faegre Drinker Biddle & Reath LLP is acting as legal counsel to Pineapple Energy.

22. On December 20, 2021, Communications Systems issued a press release announcing an amendment to its merger agreement with Pineapple, stating, in pertinent part:

**Communications Systems, Inc. Announces Amendment to Merger Agreement with Pineapple Energy LLC**

Announces Sale of Hector, Minnesota Real Estate Holdings; Provides Information on Nature of October 15, 2021 $3.50 Special Cash Dividend

December 20, 2021 08:00 AM Eastern Standard Time

MINNETONKA, Minn.--(BUSINESS WIRE)--Communications Systems, Inc. (Nasdaq: JCS) ("CSI" or the "Company") announced today that on December 16, 2021, the Company entered an amendment (Amendment") to the definitive merger agreement ("Merger Agreement") dated March 1, 2021, between the Company and privately held Pineapple Energy, LLC ("Pineapple"), a growing U.S. operator and consolidator of residential solar, battery storage, and grid services solutions.

Under the Amendment, among other things, CSI and Pineapple agreed:

- to extend the Merger Agreement Outside Date from August 31, 2021 to March 31, 2022;

- to add additional conditions to closing of the Merger Agreement, including that (i) there are binding agreements for at least $32.0 million in cash from the Equity Offering (as defined in the Merger Agreement) payable to CSI immediately following the effective time of the merger; (ii) other than as set forth in the Amendment, there will be no accrued payable amounts or liabilities on the balance sheet of Pineapple to specific related parties or affiliates of Pineapple; (iii) Hercules Capital, Inc. will have waived Pineapple's obligation to pay upon consummation of the merger $3.0 million of debt under a prior agreement and extended the maturity date of this debt to the earlier of (a) December 10, 2024 or (b) the date on which

>CSI or Pineapple receives equity financing in one more transactions in an amount in excess of $25.0 million (other than pursuant to the PIPE Agreement); and (iv) the entire amounts owed by Pineapple under a working capital loan will have been extinguished or the maturity date extended to at least December 10, 2024;

- to change the Milestone under which CSI will be obligated to issue the 3.0 million shares of its common stock as Earnout Consideration to provide that if the new closing conditions are met, CSI will be obligated to issue these 3.0 million shares;

- to extend the time for CSI to complete the Dispositions from 18 months to 24 months from the closing date; and

- to extend the time under which CSI will be obligated to issue up to 10.0 million shares of its common stock for achievement of other Milestones from on or before the 18-month anniversary to on or before the 24-month anniversary of the closing date.

In connection with the Amendment, the parties also agreed to a revised form of contingent value rights ("CVR") agreement. The principle changes in the form of CVR agreement were (i) to extend the CVR Term from 18 months to 24 months following the closing date; (ii) to provide that certain qualified letters of intent entered into prior to the closing date will be treated in the same manner as a binding agreement for purposes of determining the CVR Payment Amount, subject to certain additional conditions; (iii) to change the timing and dispute resolution process for determination of and payment of CVR Payment Amount; (iv) to clarify the treatment of net insurance proceeds as a credit to Monetization Expense; (v) to add certain limits on the duties and responsibilities of the CVR Holders' Representative; and (vi) to add a covenant prohibiting CSI or its subsidiaries following the closing date from creating or permitting any encumbrance on any of the CSI Legacy Assets (including Legacy Cash and the equity of any CSI subsidiary that was a subsidiary prior to the closing date) until the expiration of the CVR Term. Roger Lacey, CSI Executive Chair and Interim CEO stated, "CSI and Pineapple are moving with deliberate speed for a closing to occur by March 31, 2022. We expect to file our amended S-4 Registration Statement and provide notice of the special meeting to CSI shareholders in January 2022."

**Sale of Real Estate Assets**

On December 15, 2021, CSI completed the sale of its real estate located in Hector, Minnesota for $900,000. The buildings currently support the former Suttle operations that were sold to Oldcastle/Primex in 2020. As previously announced, like any transactions entered into prior to the closing of the CSI-Pineapple merger transaction, we expect 100% of net proceeds of this real estate transaction will inure to the benefit of the pre-merger CSI shareholders.

10

**Taxable Dividend**

As we previously reported, based on our preliminary analysis of the Company's accumulated earnings and profits determined for U.S. federal income tax purposes, the Company believes that the full amount of the $3.50 special dividend paid on October 15, 2021, to CSI shareholders of record at the close of business on September 30, 2021 should be treated as an ordinary taxable dividend. CSI shareholders that received the special dividend will receive an IRS Form 1099-DIV in January of 2022. CSI shareholders are encouraged to consult their own tax advisor as to the characterization of the special dividend and the U.S. federal, state, local, foreign income tax or other tax consequences.

**B. The Registration Statement Contains Materially False and Misleading Statements and Omissions**

23. The Registration Statement, which recommends that the Company's shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Communications Systems' and Pineapple's financial projections; (ii) the financial analyses performed by the Company's financial advisor, Craig-Hallum, in connection with its fairness opinion; and (iii) potential conflicts of interest involving Company insiders.

24. The omission of the material information (referenced below) renders the following sections of the Registration Statement false and misleading, among others: (i) Reasons for the Pineapple Merger Transaction and Recommendation of the CSI Board of Directors; (ii) Opinion of the Financial Advisor to CSI's Board of Directors; and (iii) Certain Financial Forecasts Utilized in Connection with the Merger.

25. Unless and until the material misstatements and omissions (referenced below) are remedied before the anticipated shareholder vote on the Proposed Transaction, Communications Systems shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

### 1. Material Omissions Concerning Communications Systems' and Pineapple's Financial Projections

26. The Registration Statement omits material information concerning Communications Systems' and Pineapple's financial projections.

27. With respect to the "*CSI Financial Forecasts*" and "*Pineapple Financial Forecasts,*" the Registration Statement fails to disclose all line items underlying such projections.

28. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and combined company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company and combined company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

29. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 2. Material Omissions Concerning Craig-Hallum's Analyses

30. In connection with the Proposed Transaction, the Registration Statement omits material information concerning analyses performed by Craig-Hallum.

31. With respect to Craig-Hallum's "*Comparable Public Company Analysis – CSI Stand-Alone,*" "*Comparable Public Company Analysis – Pineapple Stand-Alone,*" "*Precedent Transactions Analysis – CSI Stand-Alone,*" and "*Precedent Transactions Analysis – Pineapple Stand-Alone,*" the Registration Statement fails to disclose the individual multiples and financial

metrics of each company and transaction observed by Craig-Hallum in its analyses.

32. The Registration Statement fails to disclose the following concerning Craig-Hallum's "*Discounted Cash Flow Analysis – CSI Stand-Alone*": (1) the terminal values for the Company; (2) the individual inputs and assumptions underlying the (i) range of terminal LTM revenue multiples of 1.5x to 2.5x, (ii) range of terminal LTM adjusted EBITDA multiples of 11.0x to 13.0x, and (iii) range of discount rates of 16.0% to 20.0%; (3) the Company's net operating loss carryforwards; and (4) the Company's cash.

33. The Registration Statement fails to disclose the following concerning Craig-Hallum's "*Discounted Cash Flow Analysis – Pineapple Stand-Alone*": (1) the terminal values for Pineapple; (2) the individual inputs and assumptions underlying the (i) range of terminal LTM revenue multiples of 4.25x to 5.25x, and (ii) range of discount rates of 18.0% to 22.0%; and (3) Pineapple's net debt.

34. The valuation methods, underlying assumptions, and key inputs used by Craig-Hallum in rendering its purported fairness opinion must be fairly disclosed to the Company's shareholders. The description of Craig-Hallum's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses.

35. Without the information described above, the Company's shareholders are unable to fully understand Craig-Hallum's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

> **3. Material Omissions Concerning Company Insiders' Potential Conflicts of Interest**

36. The Registration Statement omits material information concerning potential

conflicts of interest involving Company insiders.

37. The Registration Statement provides that certain Company employees, including Defendant Lacey, will serve as either directors and/or officers of the combined company following consummation of the Proposed Transaction:

> **Interests of Our Directors and Executive Officers in the Pineapple Merger Transaction**
>
> \* \* \*
>
> Mark D. Fandrich, CSI's Chief Financial Officer is expected to remain in the same role following the closing of the merger and Roger H.D. Lacey, Executive Chairman of CSI, is expected to become chair of the combined company board of directors following the closing of the merger. Additionally, we also do not expect to terminate Scott Fluegge, CSI's Vice President of Information Technology and Digital Transformation, as he is expected to continue employment following the closing of the merger.

38. The Registration Statement, however, fails to disclose the details of all employment-related and compensation-related discussions and negotiations concerning the Company's officers and directors, including the parties to such communications, when they occurred, and the specific content discussed/communicated.

39. Any communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to shareholders. This information is necessary for shareholders to understand potential conflicts of interest of management and the Board. Such information may illuminate the motivations that would prevent fiduciaries from acting solely in the best interests of the Company's shareholders.

40. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

41. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

43. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Registration Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Registration Statement.

44. The false and misleading statements and omissions in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

45. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

46. Because of the false and misleading statements and omissions in the Registration Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

47. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

48. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Registration Statement.

49. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Registration Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

50. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Registration Statement and had the ability to prevent the issuance of the

statements or to cause the statements to be corrected. The Registration Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Registration Statement.

51. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

52. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

53. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 28, 2021                    Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
    zhalper@halpersadeh.com

*Counsel for Plaintiff*